Filed 8/30/21  In re J.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | D078890 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. EJ4563, EJ4563B) |
| v. | |
| J.S. et. al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

Clare M. Lemon, under appointment by the Court of Appeal, for Defendant and Appellant P.S.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

Twelve-year-old J.S. appeals from jurisdictional and dispositional orders of the juvenile court declaring him a dependent of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (b)(1) based on his exposure to domestic violence between his mother P.S. (Mother) and her boyfriend C.J. J.S. contends that the evidence did not support the juvenile court's jurisdictional findings because he only witnessed one altercation between Mother and C.J., and no risk of harm to him existed at the time of trial. J.S. also challenges the dispositional order removing him from Mother's custody, as well as the court's finding that no reasonable alternatives existed to ensure his safety absent removal. Finally, he asserts that the juvenile court's order removing him from Mother's care must be reversed due to the court's failure to expressly state its reasons for removal in violation of section 361, subdivision (e). Mother joins in J.S.'s arguments.

We conclude that substantial evidence supported the juvenile court's jurisdictional and dispositional orders, and that the failure to make required findings for the dispositional order was harmless.

FACTUAL AND PROCEDURAL BACKGROUND

*Family History*

In October 2018, J.S.'s 14-year-old sister, Jo.S., reported witnessing domestic violence between Mother and multiple ex-boyfriends. In February 2019, the San Diego County Health and Human Services Agency (Agency) opened a voluntary case due to ongoing concerns about the relationship between Mother and Jo.S., which resulted in Jo.S. refusing to return home. At that time, concerns existed regarding Mother's mental health with family describing Mother as bipolar. In March 2019, the Agency reported that the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

voluntary case with Mother and Jo.S. would be closed because Mother did not want to reunify with Jo.S.

On November 18, 2020, law enforcement arrested C.J. after a domestic violence incident in which C.J. slapped Mother causing a bruise to her face. J.S. was in another room when the incident occurred. On December 7, 2020, the Child Abuse Hotline received a report stating that J.S. had suspicious bruises on his back. At this time, J.S. or Jo.S. reported that Mother heard voices and believed that demons were talking to her. On December 10, 2020, C.J. sexually assaulted Mother in her home while J.S. was in another room. Mother suffered multiple bruises to her arms, legs, and face and swelling to the head. She also vomited blood. Mother reported that C.J. had been sexually assaulting her two to four times each day for the past two months, and that the assaults included strangulation. Mother reported that J.S. heard the arguments between her and C.J. Law enforcement arrested C.J. and transported Mother to the hospital for a SART exam. An emergency protective order was issued and served.

During a video-taped interview with a sheriff's detective on December 16, 2020, Mother reported that C.J. raped her daily. Mother expressed concern that C.J. would never let her go and would "shoot her in the head." A social worker who met with Mother that day stated that Mother "appeared emotionally unstable as her mood would shift from crying to frustrated, to calm, in rapid cycles." Mother reported that she suffered from bipolar disorder and had been off her medications for several days. The social worker talked to Mother about filing a restraining order against C.J., but Mother did not follow through with this suggestion. On December 18, 2020, Mother visited a courthouse to extend the emergency protective order but did not complete the paperwork claiming she could not focus because she was off

3

her medications. On December 24, 2020, a sheriff's detective observed Mother and C.J. in the parking lot of Mother's apartment complex holding hands. Mother also failed to cooperate with law enforcement regarding the domestic violence and rape investigations.

On January 10, 2021, C.J. went to Mother's apartment, saw J.S., and then left. When this occurred, Mother was moving her car. Mother returned to the apartment and barricaded the doors with appliances and other items inside the home. Later that evening, C.J. broke through the front door and barrier, yelled at Mother, and threw her on the ground causing her to scrape her knee on the carpet. When J.S. picked up Mother's phone, C.J. tackled him and wrestled him for the phone. J.S. reported that C.J. punched him three times, including once in his left eye, broke the phone, and tried to prevent Mother and him from leaving. At one point, C.J. smashed J.S.'s head between a skateboard and another object.

When Mother and J.S. were able to leave the apartment, C.J. took a hammer and began destroying the apartment by breaking doors and personal property. C.J. left the apartment before deputies arrived. Another emergency protective order was granted for Mother and J.S. Mother later admitted that C.J. had been staying in her apartment since his release from jail on December 19, 2020.

On January 13, 2021, Mother reported that J.S. suffered trauma from everything that happened with C.J. and that she had failed to protect him. That same day she applied for a restraining order but Mother did not appear for the court hearing and the restraining order was dismissed. Even after Mother filed for a restraining order she continued to frequent an area which C.J. also frequented.

4

*Dependency Proceedings*

On January 14, 2021, the Agency filed a dependency petition for J.S. under section 300, subdivision (b)(1) alleging that he had been exposed to domestic violence.[2] At that time, J.S. was staying at a neighbor's home with Mother's permission. The Agency later detained J.S. at Polinsky Children's Center (PCC). At the detention hearing on January 19, 2021, the juvenile court appointed counsel for Mother and J.S. The court detained J.S. and ordered supervised visits for Mother.

On January 24, 2021, law enforcement reported to a domestic disturbance involving Mother and her new boyfriend. On February 7, 2021, at 2:23 a.m., law enforcement reported to a disturbance involving Mother. Officers reported that Mother wanted units to check the area for "300 subjects involved in a massive orgy and wearing demonic costumes." Less than 15 minutes later, law enforcement was again called after Mother claimed that she heard kids being hurt and that an unknown man wanted to hurt her. During a welfare check officers reported that Mother was rambling about orgies and claimed that she had pictures of demons.

On March 2, 2021, Mother contacted the social worker to report that she had completed a few domestic violence groups and signed up for therapy through her private insurance. Mother also agreed to sign a release of information for her therapist. The contested jurisdictional and dispositional hearing on March 17, 2021 proceeded as a trial on the documents. At the hearing, J.S.'s guardian ad litem informed the court that J.S. wished to return to Mother but submitted on the Agency's report and joined the Agency's arguments. The juvenile court found the allegation in J.S.'s petition

---

[2]     Mother does not know the identity of J.S.'s father.

true by clear and convincing evidence and denied Mother's request to return J.S. to her care. The court also required Mother to drug test for 90 days and submit to a psychological evaluation if recommended by Mother's therapist.

DISCUSSION

## I. *GENERAL LEGAL PRINCIPLES*

A parent may seek review of both the jurisdictional and dispositional findings on an appeal from the dispositional order. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) We review the juvenile court's jurisdictional and dispositional orders for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) The burden of proof for jurisdictional findings is preponderance of the evidence; for removal, it is clear and convincing evidence. (*Cynthia D.*, at p. 248.)

In applying the substantial evidence standard of review, " ' "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

## II. *SUBSTANTIAL EVIDENCE SUPPORTS THE JURISDICTIONAL FINDINGS*

To establish jurisdiction under section 300, subdivision (b)(1), the Agency must show: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) The third element requires a showing that at the time of the

6

jurisdictional hearing the child is at substantial risk of serious physical harm in the future.  (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.)  Domestic violence "may support the exercise of jurisdiction only if there is evidence that the violence harmed the children or placed them at risk of harm, and 'the violence is ongoing or likely to continue.'"  (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1453.)  To show the child faces a risk of harm at the time of the jurisdiction hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur."  (*In re James R.* (2009) 176 Cal.App.4th 129, 136, abrogated in part on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 628.)  However, a parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' "  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

J.S. argues that the juvenile court erred in finding jurisdiction because he was exposed to only one violent confrontation and did not know about the sexual assaults.  He also contends that by the time of the challenged jurisdictional finding in March 2021 no risk of harm existed because Mother had ended her relationship with C.J., recognized her failure to protect, and was attending therapy and a support group for domestic violence victims.  We disagree.

Mother started dating C.J. in September 2020.  Police arrested C.J. after a domestic violence incident in November 2020.  Police again arrested C.J. in December 2020 after C.J. sexually assaulted Mother.  J.S. was in another room when both incidents occurred.  During the December incident, Mother suffered multiple bruises and swelling to her head.  After the December incident, Mother reported that C.J. had been sexually assaulting her two to four times each day for the past two months and that J.S. heard

7

the arguments between her and C.J.  During this time, J.S. was not attending school.

In January 2021, C.J. broke into the home and physically assaulted Mother.  During this incident, C.J., who weighed 215 pounds, tackled J.S., punched him three times, and smashed his head between two objects.  Although Mother and J.S. escaped, C.J. then used a hammer to cause "significant damage" to the home hitting objects like the television, doors, electronic devices, and walls.  In her January 13, 2021 application for a temporary restraining order, Mother reported C.J.'s repeated sexual and physical assaults over a two-month period stating that J.S. "constantly asked [C.J.] to stop hurting her and to leave the home."  Mother also admitted that the incidents between her and C.J. caused J.S. emotional trauma.

From this evidence the juvenile court could reasonably infer that J.S. was home during most, if not all, of these incidents, that he heard the assaults and observed the aftereffects of these assaults on Mother and his home.  As one court put it:  "[D]omestic violence in the same household where children are living *is* neglect; it is a failure to protect [them] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.  Such neglect *causes* the risk." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194, disapproved on other grounds in *In re R.T.* (2017) 3 Cal.5th 622, 628.)  "[C]ommon sense and expert opinion indicate [domestic] violence is detrimental to children." (*In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470, fn. 5.)

We reject J.S.'s argument that a risk of harm no longer existed at the time of the jurisdictional hearing because Mother had ended her relationship with C.J. Jo.S. reported witnessing domestic violence between Mother and multiple ex-boyfriends before Mother started her relationship with C.J. Two weeks after C.J.'s sexual assault left her bruised and vomiting blood, a sheriff's detective observed Mother and C.J. in the parking lot of Mother's apartment complex holding hands. The following month, law enforcement reported to a domestic disturbance involving Mother and her new boyfriend. This evidence suggests a pattern of behavior over a long period of time involving different abusive men that presented a very real risk to J.S.'s physical and emotional well-being that was not likely to end absent juvenile court intervention.

J.S.'s reliance on *In re Ma.V.* (2021) 64 Cal.App.5th 11 (*Ma.V.*) for the proposition that he was no longer at risk at the time of trial is misplaced. The jurisdictional allegations in *Ma.V.* were predicated on two domestic incidents that occurred in one month at the beginning of the case, ten months before the jurisdictional hearing. (*Id.* at pp. 14–15, 21.) Here, the last reported domestic violence incident between Mother and C.J. occurred on January 10, 2021, approximately two months before the contested jurisdictional hearing. However, two weeks after this incident with C.J., Mother and her new boyfriend engaged in a domestic violence incident serious enough to require law enforcement involvement. The juvenile court reasonably could have found that, at the time of the jurisdiction hearing, J.S. remained at risk.

In summary, substantial evidence supported the juvenile court's jurisdictional finding under section 300, subdivision (b)(1) relating to domestic violence.

### III. *SUBSTANTIAL EVIDENCE SUPPORTS*
### *THE DISPOSITIONAL ORDER*

"At the disposition hearing, the court must decide where the minor will live. The options 'may range from supervised custody (§ 362) to removal of the child from the home. (§ 361.) The court's principal concern is a disposition consistent with the best interests of the minor.'" (*In re Tasman B.* (1989) 210 Cal.App.3d 927, 931.) A child may be removed from the parent's custody at the dispositional hearing where "'return of the child would create a substantial risk of detriment to the child's physical or emotional well-being.'" (*In re H.E.* (2008) 169 Cal.App.4th 710, 720.) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) A child does not have to be "actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136 (*T.V.*).)

Before the juvenile court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence that: (1) a substantial danger exists to the well-being of the minor if the minor were returned home, and (2) there are no reasonable means to protect the minor's physical health without removing the minor from the parent's physical custody. (§ 361, subd. (c)(1).) "'Clear and convincing' evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt." (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208.) The jurisdictional findings are prima facie evidence on the first issue. (*Ibid.*) As to the second issue, the juvenile court must also determine

"whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

" '[O]ur dependency system is premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests.' [Citation.] The requirement for a discussion by the child welfare agency of its reasonable efforts to prevent or eliminate removal (Cal. Rules of Court, rule 5.690(a)(1)(B)(i)), and a statement by the court of the facts supporting removal (§ 361, subd. ([e])), play important roles in this scheme. Without those safeguards there is a danger the agency's declarations that there were 'no reasonable means' other than removal 'by which the [children's] physical or emotional health may be protected' and that 'reasonable efforts were made to prevent or to eliminate the need for removal' can become merely a hollow formula designed to achieve the result the agency seeks." (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 810 (*Ashly F.*).) We examine the record to determine whether a reasonable trier of fact could have regarded the evidence establishing the section 361 requirements as satisfying the clear and convincing standard of proof. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 ["When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."].)

J.S. contends that the dispositional order must be reversed because Mother ended her relationship with C.J., the record does not support a reasonable inference that Mother has suffered from a pattern of abusive

11

relationships, and Mother was in therapy and attending a support group for domestic violence victims. We again disagree.

As discussed above, the record supports the inference that C.J. sexually and physically assaulted Mother on numerous occasions while J.S. was in the home, which placed him at risk of harm.[3] (*Ante*, pt. II.) Moreover, although J.S. argues that Mother had ended her abusive relationship with C.J., Mother's history shows that she stayed with C.J. despite his daily attacks for months and did not seek help from law enforcement until the November 18, 2020 incident. She then reunited with C.J. even after the December 10, 2020 sexual assault left her bruised and vomiting blood.

Although Mother ultimately sought law enforcement assistance for the incidents that occurred in November and December 2020, she failed to cooperate with the investigation, failed to extend the emergency protective order, and allowed C.J. to live with her and J.S. after C.J.'s release from jail. After C.J. broke into the apartment, assaulted Mother, and attacked J.S., she still failed to obtain a restraining order.[4] Even more concerning, Mother has

---

[3] At the contested hearing, Mother's counsel denied that allegation that C.J. had sexually assaulted Mother, claiming that while Mother might have been sexually assaulted "at some point in her life" that "it was never by [C.J.]." As the trier of fact, the trial judge " 'is the sole judge of the credibility and weight of the evidence' " and determines whether "a witness is to be believed or not believed." (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099.) The juvenile court could have rejected Mother's denial and credited her statements to law enforcement after the December 2020 incident regarding daily assaults by C.J. over a two-month period.

[4] J.S. points out that the juvenile court had jurisdiction to issue an ex parte protective order under section 213.5 to protect him and Mother but the Agency never requested a protective order. We agree that the Agency could have made such a request but point out Mother's failure to keep a protective order in place as relevant to her lack of insight into how domestic violence impacted J.S.

a history of abusive relationships and, at the time of the dispositional hearing, had just completed a few domestic violence groups and had not yet started therapy. While Mother's nascent efforts to gain insight into the risk domestic violence poses to J.S. are hopeful, on this record, the juvenile court could have reasonably concluded that Mother's domestic violence issues remained and posed a substantial risk to J.S.'s physical safety and emotional well-being absent removal. (See *T.V.*, *supra*, 217 Cal.App.4th at p. 133 ["A parent's past conduct is a good predictor of future behavior."].)

The court's minute order found that "[r]easonable efforts have been made to prevent or eliminate the need for the removal of the child from the mother's home and make it possible for the child to return to the child's home." The juvenile court, however, did not "state the facts" supporting its decision. The court's boilerplate findings in the minute order are not a sufficient substitute for the juvenile court making necessary factual findings on the record tailored to the case. (See *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067 ["the juvenile court erred when it removed [the child] from mother's custody without stating the facts supporting removal"].)

Nonetheless, this error alone does not warrant reversal. The failure to make the required findings under section 361, subdivision (e) is deemed harmless if " 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.' " (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) On this record, we find it not reasonably probable the result would have been more favorable to Mother but for this error.

13

As the Agency notes, this was not a two-parent case where removal of an offending parent from the home existed as a reasonable alternative to removal. (§ 361, subd. (c)(1)(A) & (B); see, e.g., *Ashly F., supra*, 225 Cal.App.4th at p. 810 [juvenile court erred in not considering removal of the offending mother from the home when record showed this reasonable alternative existed].) Rather, at the contested hearing, Mother did not identify any reasonable alternatives to removal and she suggests no such alternatives on appeal.

The jurisdiction/disposition report noted that Mother did "not appear to listen" when the social worker explained the Agency's safety concerns. This troubled the social worker because it suggested that Mother "does not appear to have insight into the protective issues" regarding J.S. Given Mother's propensity to enter into abusive relationships, the juvenile court reasonably concluded that the only way to ensure J.S.'s safety was to remove him from Mother's custody until such time as Mother demonstrates insight regarding the detrimental impact exposure to domestic violence has on a child. On this record, the error in failing to make the factual findings required by section 361, subdivision (e) was not prejudicial and does not require reversal. (See *In re Dakota J.* (2015) 242 Cal.App.4th 619, 630 [reviewing court may not reverse a removal order unless the error was prejudicial].)

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.


McCONNELL, P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.